RAB:PT
F.#2012R00807

**13 M 146**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MUZAFFAR NADEEM, also known as
    "Nadeem Muzaffar" and "Ali,"
AFZAAL CHAUDRY, also known as
    "Tariq,"
ZAINUL SYED, also known as
    "Syed Zainul" and "Zaine,"
IRFAN MUZAFFAR and
ARUN GANDHAM,

        Defendants.

- - - - - - - - - - - - - - - - - X
- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-

THE PREMISES KNOWN AND DESCRIBED AS
244-246-248 ~~EAST~~ 52ND STREET,
BROOKLYN, NEW YORK

- - - - - - - - - - - - - - - - - X
- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-

THE PREMISES KNOWN AND DESCRIBED AS
THE BEDROOM USED BY AFZAAL CHAUDRY
WITHIN THE BASEMENT LEVEL OF 14 BAY
20TH STREET, BROOKLYN, NEW YORK

- - - - - - - - - - - - - - - - - X

TO BE FILED UNDER SEAL

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF APPLICATION FOR ARREST
WARRANTS AND SEARCH
WARRANTS

(T. 18, U.S.C., §§ 1349
and 2; T. 31, U.S.C.,
§ 5324)

3

together with others, for the purpose of evading the reporting
requirements of Title 31, United States Code, Section 5313(a),
and the regulations prescribed thereunder, did knowingly and
intentionally structure and assist in structuring transactions
with one or more domestic financial institutions, by cashing
multiple checks in amounts of less than $10,000 at one or more
domestic financial institutions on the same day, thereby breaking
amounts of currency in excess of $10,000 into amounts less than
$10,000.

(Title 31, United States Code, Sections 5324(a)(3) and
5324(d)(1); Title 18, United States Code, Sections 2 and 3551 et
seq.)

Upon information and belief, there is probable cause to
believe that there is currently concealed in (1) THE PREMISES
KNOWN AND DESCRIBED AS 244-246-248 EAST 52ND STREET, BROOKLYN,
NEW YORK ("SUBJECT PREMISES #1") further described in Attachment
A1, the things described in Attachment A2; and (2) THE PREMISES
KNOWN AND DESCRIBED AS THE BEDROOM USED BY AFZAAL CHAUDRY WITHIN
THE BASEMENT LEVEL OF 14 BAY 20th STREET, BROOKLYN, NEW YORK
("SUBJECT PREMISES #2") further described in Attachment B1, the
things described in Attachment B2, all of which constitute
evidence, fruits and instrumentalities of violations of Title 18,
United States Code, Section 1349, to wit: conspiracy to commit

4

mail fraud, and Title 31, United States Code, Section 5324, to wit: structuring financial transactions.

(Title 18, United States Code, Section 1349; Title 31, United States Code, Section 5324)

The source of your deponent's information and the grounds for his belief are as follows:

I.   Introduction

1.   I have been a Special Agent with IRS-CI since 1991.  The work of the IRS-CI includes, among other things, investigating fraud involving the underpayment of workers in violation of various federal, state and municipal laws.  These investigations are conducted both in an undercover and overt capacity.  In my capacity as a Special Agent with IRS-CI, I have executed numerous arrest warrants and search warrants.

2.   I am familiar with the facts and circumstances of this investigation from my personal observations, surveillance photographs, video images captured by a pole camera, my conversations with a cooperating witness, recordings made by a cooperating witness, certified translations of those recordings, conversations with and reports by other IRS-CI agents and personnel of other law enforcement authorities, including but not limited to the United States Department of Labor, Office of Inspector General; the New York City Police Department; the Office of the New York State Attorney General's Organized Crime

Task Force; and the SCA Office of Inspector General, which include information obtained from confidential sources, as well as my review of bank records, financial transaction data collected by the United States Department of the Treasury and other records and reports.

3.   Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the above-named defendants and search the above-named premises, I have not set forth each and every fact learned during the course of this investigation.   Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrants and search warrants sought herein.   In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

II.   <u>Background</u>

A.   <u>Prevailing Wage Requirements</u>

4.   At all times relevant to this affidavit, New York State Labor Law Section 220 <u>et seq.</u> (hereinafter "Section 220") (also known as New York State's "Little Davis-Bacon Act") provided, in relevant part, that each contract to which the State

6

of New York, a public benefit corporation, a municipal
corporation or a commission appointed pursuant to law (a "public
agency"), was a party for the construction, alteration, and/or
repair of a public works project must contain a provision
requiring that laborers, workmen and mechanics be paid a
prevailing wage rate (the "prevailing wage"). The prevailing
wage was determined by the New York State Department of Labor, or
the New York City Comptroller (the "Comptroller") if the work was
performed by agencies of the City of New York. In either case,
the prevailing wage was required to consist of a basic hourly
rate and "fringe benefits"[1] based on job classification and the
geographical area where the work was performed. The SCA, which

---

[1]     Pursuant to Section 220, such fringe benefits were paid
in the following manner: if the wage-earner in question was a
member of a qualified labor union, the benefits portion of the
prevailing wage was paid by the employer directly into the wage-
earner's labor union's benefit funds for health care, training
and the like which were administered by the union; if the wage-
earner was not a member of a qualified labor union, the wage-
earner himself or herself directly received the benefits portion
of the prevailing wage rate as additional monetary compensation
from the employer. However, at all times relevant to this
affidavit all SCA construction contracts required general
contractors to use workers who were covered by collective
bargaining agreements ("CBAs") between general contractors or
subcontractors and qualified labor unions. The CBAs, in turn,
required those general contractors and subcontractors to employ
on all projects only workers who were members of a qualified
labor union. The CBAs further required those employers to make
the requisite payments into the union benefit funds on behalf of
each worker employed by the general contractor or subcontractor,
even if a worker, contrary to the CBA and contrary to the general
contractor's contract with the SCA, was not a member of a
qualified labor union.

was created by the New York State Legislature for the purpose of
commissioning and supervising the construction and rehabilitation
of public schools in New York City, was a public agency for the
purposes of Section 220. General contractors and subcontractors
working on SCA projects were therefore required to pay their
workers the prevailing wage set by the Comptroller.

     5.    Section 220 also required general contractors to
certify that they had complied with the prevailing wage
requirements prior to receiving payment under a contract with a
public agency for a public works project. To comply with this
provision, contractors on SCA projects were required by Section
220, as well as by the terms of their contracts with the SCA, to
regularly submit "certified payroll" forms to the SCA that
certified, among other things and under penalty of perjury, the
names of the workers who performed construction work on a
particular project, the number of hours those workers worked, how
much they were paid and whether they were members of a qualified
labor union. In order for a general contractor on an SCA project
to get paid for its work and for the work of its subcontractors,
the general contractor was required to submit a "request for
payment" to the SCA. After the SCA approved a request for
payment (an approval that was based, in part, on the SCA's
receipt of completed certified payroll forms for the relevant
time period showing that all workers on the SCA project had

received the prevailing wage as required), the SCA distributed
payment to the general contractor in the form of a check.
Typically, the SCA sent these checks to general contractors via
the United States Postal Service.

B.   The Cooperating Witness

6.   A cooperating witness (the "CW") was the nominal
owner of a subcontracting company (the "Subcontractor") that
performed bricklaying, masonry and related construction work on
various SCA contracts.  In or about September 2011, the CW was
confronted by law enforcement agents after he was recorded paying
a cash bribe to an SCA inspector.  The bribe, which the CW paid
at the direction of the defendant MUZAFFAR NADEEM, was intended
to, among other things, corruptly cause the SCA inspector to
refrain from reporting to the SCA that the Subcontractor was
failing to pay the prevailing wage to workers doing construction
work on an SCA-funded project.  After law enforcement agents
confronted the CW, he admitted his role in the bribery scheme, as
well as a broader scheme with other individuals to avoid paying
the prevailing wage on many SCA projects, and began cooperating
with law enforcement.  The CW's information has proven reliable
and has been corroborated by, among other things, consensual
recordings, images captured by a pole camera, bank records and
contracts.

7.    The CW has entered into a cooperation agreement
(the "Agreement") with the New York County District Attorney's
office ("DANY").  As required by the Agreement, the CW has
pleaded guilty in New York County Supreme Court to Bribery in the
Second Degree and Falsifying Business Records in the Second
Degree, in violation of Sections 200.03 and 175.10, respectively,
of the New York Penal Law.  These crimes carry maximum penalties
of five to fifteen years' imprisonment and one and one third to
four years' imprisonment, respectively.  In exchange for his
cooperation with state and federal authorities, the CW hopes to
receive leniency when he is sentenced on those charges in New
York County Supreme Court.  Alternatively, pursuant to the
Agreement, DANY may request that the New York County Supreme
Court vacate these felony charges and permit the CW to plead
guilty to the misdemeanor offense of Obstruction of Government
Administration in violation of New York Penal Law 195.05, with a
sentence of a conditional discharge.  Pursuant to the Agreement,
the CW has forfeited to the DANY $500,000 in proceeds the CW
received for his participation in the broader prevailing wage
fraud scheme.

8.    The CW has informed me that all of the
Subcontractor's work was done as a subcontractor for a
construction company named SM&B Construction Co., Inc. ("SM&B"),
which served as a prime general contractor for SCA projects.

Since 1997, the SCA has awarded SM&B more than a dozen contracts with a total value of over $72 million. SM&B was controlled by its Chief Executive Officer, the defendant MUZAFFAR NADEEM, whom the CW also knew by the name of "Ali." The CW has further informed me that NADEEM and his associates, in particular the defendants ZAINUL SYED and AFZAAL CHAUDRY, actually controlled some of the subcontractors that SM&B engaged to do work on SCA projects for which SM&B won the bidding, including the Subcontractor. Indeed, the CW only became the legal owner of the Subcontractor at NADEEM's suggestion in or about December 2007, after NADEEM gave the CW $10,000 so the CW could purchase the Subcontractor from a third party. The CW has never repaid these funds to NADEEM.

9. Thus, while the CW was the legal owner of the Subcontractor, the defendants MUZAFFAR NADEEM, ZAINUL SYED and AFZAAL CHAUDRY controlled the Subcontractor and made all relevant decisions relating to the Subcontractor's business, including: whether to bid for a job, and what amount to bid (the Subcontractor, at NADEEM, SYED and CHAUDRY's direction, never bid for work on projects except SCA jobs for which SM&B served as the general contractor); how many workers to hire for a particular job, and which workers to hire; and which checks to write on the Subcontractor's bank accounts (SYED maintained and controlled the Subcontractor's checkbook). According to the CW, most outside

observers who interacted with the CW at the Subcontractor's job sites were under the impression that the CW was employed as a supervisor by SM&B and had no idea that the CW owned the Subcontractor.  Since December 2007, when the CW purchased the Subcontractor with funds provided by NADEEM, NADEEM and his associates have given the CW hundreds of thousands of dollars to serve as the nominal owner of the Subcontractor.[2]

III. The Scheme to Defraud the SCA

10.   The CW has informed me that SM&B and the subcontractors it controlled, including the Subcontractor, did not pay all of the workers on SM&B's SCA-funded projects the prevailing wage.[3]  Instead, at the direction of the defendants MUZAFFAR NADEEM, ZAINUL SYED and AFZAAL CHAUDRY, the Subcontractor (and at least some of SM&B's other subcontractors) paid most of the workers who actually labored on SM&B's SCA-funded projects at a rate far below the prevailing wage.  Since the CW began participating in the scheme in December 2007, SM&B

_____

[2]     During this period, the CW also earned wages from the Subcontractor by actually supervising bricklaying and masonry work performed by the Subcontractor on SCA projects.  In connection with these wages, the CW has caused false payroll forms to be submitted to the SCA about his work hours, i.e. he submitted forms claiming to have worked more hours than he actually worked, and accordingly received fraudulently inflated wages.

[3]     As a general contractor on SCA projects (see supra ¶¶ 4-5), SM&B was required by all of its contracts with the SCA, as well as by Section 220, to ensure that workers on SM&B's SCA-funded projects were paid the prevailing wage.

has received over $32 million from the SCA for its work as a general contractor on SCA projects. To avoid creating a record of the fact that the Subcontractor and other SM&B subcontractors were not paying their workers the prevailing wage, NADEEM, SYED and CHAUDRY caused many of the workers on SM&B's SCA projects to be paid in cash. NADEEM, SYED and CHAUDRY therefore regularly needed to obtain tens of thousands of dollars in cash to pay workers.

11. The CW has informed me that the defendants MUZAFFAR NADEEM, ZAINUL SYED and AFZAAL CHAUDRY obtained the large amounts of cash necessary to make these wage payments by writing checks to the Subcontractor (and other entities) on bank accounts held in the name of SM&B. NADEEM and SYED then caused other people, including the defendant IRFAN MUZAFFAR (a son of NADEEM) and the CW, to cash those checks at a check-cashing business named Pacific New Jersey Corporation and doing business as "Pacific Check Cashing" (hereinafter "Pacific"), located in Jersey City, New Jersey. NADEEM, SYED, CHAUDRY and their associates wanted to keep law enforcement authorities from learning about these large cash transactions because, among other reasons, they did not want to cause law enforcement to suspect that SM&B or its subcontractors were paying cash wages to workers on SCA-funded projects, which would alert law enforcement to the likelihood that workers on SM&B's SCA projects were not paid the

13

prevailing wage.  NADEEM, SYED, CHAUDRY and their associates
therefore wanted to avoid causing Pacific to file currency
transaction reports ("CTRs"), which financial institutions
(including check-cashing businesses) are legally required to file
with the United States Department of the Treasury after
processing any cash transaction involving $10,000 or more in
United States currency.

12.   To avoid causing Pacific to file CTRs, the
defendants MUZAFFAR NADEEM and ZAINUL SYED caused the defendant
IRFAN MUZAFFAR, the CW and others to illegally structure these
check-cashing transactions by cashing multiple checks in amounts
of less than $10,000 on the same day.[4]  I have reviewed the bank
records of SM&B and Pacific and have confirmed that on many
different days during the period from September 2009 through June
2012, multiple checks in amounts of less than $10,000, but
totaling more than $10,000, were written on SM&B's account to the
Subcontractor and then cashed on the same day at Pacific, worth a
total amount of approximately $1.9 million.  Also, from January
2008 through September 2009, on many different days multiple

_____

[4]      The CW has informed me that in or about July 2012,
employees of Pacific informed the CW that Pacific would not file
a CTR, even if the CW or anyone else associated with SM&B cashed
a check worth $10,000 or more at Pacific.  Since that
conversation, on the occasions when the CW has gone to Pacific to
obtain cash for SM&B, he has done so by cashing a single check
worth more than $10,000, made out from SM&B to the Subcontractor
as before.  Treasury Department records show that Pacific did not
file CTRs for those transactions, as required.

checks in amounts of less than $10,000, but totaling more than $10,000, were written on SM&B's account to entities other than the Subcontractor, and then cashed on the same day at Pacific. These checks were worth a total amount of approximately $1.7 million. Usually, these groups of checks were cashed at intervals approximately two weeks apart, consistent with the cash obtained being used to make bi-weekly payroll payments.

13. The defendants MUZAFFAR NADEEM, ZAINUL SYED and AFZAAL CHAUDRY submitted to the SCA, or caused other SM&B employees to submit to the SCA, certified payroll forms for work performed by the Subcontractor, as well as for work performed by other subcontractors.[5] These certified payroll forms falsely stated, among other things, that they included the names of all workers who performed work on projects for which SM&B was paid by the SCA, the number of hours those workers worked, how much they were paid and whether they were members of a labor union. Many of the people who actually did work on SCA projects for the Subcontractor were not included on the certified payroll forms

---

[5] Consistent with standard SCA procedures, these certified payroll forms were submitted electronically, via computer, to the SCA's designated vendor. The defendant ZAINUL SYED directed the CW to give SYED a copy of the CW's signature, which SYED captured electronically. Thus, also consistent with SCA procedure, these fraudulent certified payroll forms for the Subcontractor's employees were submitted with the CW's electronic signature, on behalf of the Subcontractor. The CW, however, did not actually have anything to do with the creation, certification or submission of these fraudulent certified payroll forms.

which were submitted to the SCA on behalf of the Subcontractor, because those workers had been paid less than the prevailing wage, in cash.[6] SCA records show that in reliance, in part, on these fraudulent certified payroll forms, the SCA mailed checks to SM&B at SM&B's Brooklyn offices.

IV. <u>Recorded Conversations and Meetings</u>

A. <u>Meeting With NADEEM To Discuss Wages for Bricklayers</u>

14. On June 6, 2012, while equipped with a recording device provided by law enforcement, the CW consensually recorded a meeting he had with the defendant MUZAFFAR NADEEM[7] at SMB's office, which was located in a building consisting of the addresses 244, 246 and 248 ~~East~~ 52nd Street in Brooklyn, New York (the "SM&B Office").[8] During the meeting, the CW discussed with NADEEM how much money bricklayers working on a $4.7 million SCA-funded project at an elementary school in Brooklyn (the "Project") should be paid.[9] SM&B was the prime contractor for

_____

[6] According to the CW, neither SM&B nor the Subcontractor made payments to union benefits funds on behalf of workers who were paid in cash, in violation of the CBAs between qualified unions and the Subcontractor.

[7] Unless otherwise indicated, all recorded conversations described in this affidavit took place in Punjabi and have been translated into English by a court-certified Punjabi-English translator.

[8] These three addresses comprise a single structure with different exterior entrances, all connected internally.

[9] The SCA's contract with SM&B for work on the Project required SM&B to ensure and certify that all workers on the

the Project, and the Subcontractor was responsible for bricklaying and masonry work on the Project.  Pursuant to Section 220 and prevailing wage rates set thereunder by the Comptroller for the period including May 2012, workers performing bricklaying work ("bricklayers") on SCA-funded projects were legally entitled to be paid $72.47 in combined wages and benefits per hour, or approximately $580 in wages and benefits for an eight-hour day; workers doing caulking work ("caulkers") were entitled to $67.73 in combined wages and benefits per hour, or approximately $542 per day; and mason tenders (the least skilled class of workers needed for brickwork projects, or "laborers") were entitled to be paid $57.64 in combined wages and benefits per hour, or approximately $461 for an eight-hour day.

15.  In fact, as demonstrated by the CW's recorded conversation with the defendant MUZAFFAR NADEEM, NADEEM instructed the CW to pay bricklayers and laborers on the Project far less than the legally required prevailing wage:

---

Project (including workers employed by subcontractors that SM&B engaged, such as the Subcontractor) were paid the prevailing wage, and that all workers on the Project (including workers employed by subcontractors, such as the Subcontractor, that SM&B engaged) were members of qualified labor unions.

CW:     Tell [UI] to ask [the Head Bricklayer][10] is
        he going to be paying 300 to 350 [dollars per
        day] for bricklayers...

MN:[11] Brother, no one gives more than 250.

CW:     Just make sure?

MN:     I have already asked him.

CW:     He said 250?

MN:     Yes.  And he said there are one or two guys
        that will ask for more money, but we don't
        use them.

CW:     Then that's good.

MN:     I told him that we can't give that much,
        since we don't have it.  We are all broke.

CW:     Remember there was a guy named Minder, who
        worked with them before. . . are willing to
        work for 200.  And he has six or seven
        people.

_____

[10]     According to the CW, the Head Bricklayer was a
bricklayer whom NADEEM and his associates engaged to bring a
sufficient number of bricklayers to all of the jobsites where the
Subcontractor worked on SM&B's projects for the SCA, including
the Project.  Most of these bricklayers were not members of the
bricklayers union, as required by SM&B's contract with the SCA
and the Subcontractor's CBA with the bricklayers union.  None of
the Head Bricklayer's bricklayers, regardless of whether or not
they belonged to the union, were paid the prevailing wage by the
Subcontractor or SM&B.  NADEEM, the defendant ZAINUL SYED or the
defendant AFZAAL CHAUDRY frequently gave the Head Bricklayer the
wages of bricklayers who worked on SM&B's jobsites, and the Head
Bricklayer in turn distributed those wages to his bricklayers.
Sometimes, the Head Bricklayer received that money in the form of
cash, and sometimes SYED gave the Head Bricklayer a large check
from SM&B to a company owned by a relative of the Head
Bricklayer, which check the Head Bricklayer himself broke into
cash to pay his bricklayers.

[11]     The defendant MUZAFFAR NADEEM is abbreviated here as
"MN."

18

MN:   Why didn't you tell me before?

Later, the CW suggested giving the caulkers and laborers on the

Project a raise of about five dollars per day, but NADEEM

refused:

>               CW:   And, plus, our people are saying to raise it
>                     five, five or four dollars.
>
>               MN:   Just tell them they are lucky that they are
>                     getting paid.

B.   Meetings to Discuss Getting Cash to Pay Wages

        16.   Later on June 6, 2012, while still equipped with a

recording device, the CW met with the defendant ZAINUL SYED at

the SM&B Office and consensually recorded the meeting.  The

defendant MUZAFFAR NADEEM employed SYED at SM&B in a capacity

akin to an office manager based at the SM&B Office.   During the

meeting, the CW discussed with SYED who would go to New Jersey to

get the cash at Pacific to pay workers on the Project:

>               CW:   Are we the ones who are going to get the cash
>                     for [the Head Bricklayer]?
>
>               ZS:[12] We have to pay the people.
>
>               CW:   Are we the ones who are going to get all the
>                     cash?
>
>               ZS:   Those are the employees that workers on the
>                     jobsite, by day we will pay them.  That I
>                     would like to ask him.  Give him the money
>                     for those days that they work.

        17.   Later the same day at the SM&B Office, the CW and

---

[12]   The defendant ZAINUL SYED is abbreviated as "ZS."

the defendant ZAINUL SYED discussed the need to call Pacific

before driving there, to make sure Pacific had enough currency on

hand to cash the tens of thousands of dollars in checks written

on an SM&B bank account that SM&B needed to pay its workers:

> CW:    . . . We have to go to Jersey. [UI].  For
> [the Head Bricklayer].
>
> ZS:   No, let's just get it right now.  Let's ask
> them first.
>
> CW:   Call him and ask him.  And see what he says.
>
> ZS:   First get it ready.  And we can do it half
> and half,[13] if it's a little extra.

### C.   Calculating Workers' Wages

18.  A short time later on the same day, the CW, the

defendant ZAINUL SYED and the defendant AFZAAL CHAUDRY[14] assessed

the amount of cash they needed to obtain in order to pay each of

the caulkers and laborers (to whom they referred, collectively,

as "Workers," as distinct from "bricklayers," who performed a

more skilled category of work) on the Project their wages.

During this meeting, CHAUDRY read from a spiral notebook in which

---

[13]    By "half and half," the CW and I understood that SYED
meant making two separate trips to Pacific on different days and
cashing checks worth half the needed amount each day.

[14]    The defendant AFZAAL CHAUDRY, a cousin of the
defendant MUZAFFAR NADEEM, was SM&B's foreman for all
construction work done at the Project jobsite and other, earlier
SCA jobsites where SM&B had done jobs.  In that capacity, CHAUDRY
performed many functions that the CW should otherwise have
performed, as the head of the Subcontractor, but for the fact
that the CW's ownership of the Subcontractor was a sham, and the
Subcontractor was actually dominated and controlled by NADEEM.

he kept handwritten "charts" of all of the hours worked by all of
the workers at the Project jobsite during the previous few
months, generally broken out by two-week pay period. Typically,
CHAUDRY kept this "tally" of hours worked by observing the
workers at the Project jobsite. SYED took that information as
relayed by CHAUDRY and wrote on a separate piece of paper a list
of the bricklayers and Workers at the Project jobsite who needed
to be paid for their work during the pay period in question, the
number of hours they had worked during that pay period:

> ZS: Okay, let me write it down. And also a
> bricklayers too. Until the first. These are
> in eight days or six days. We have paid for
> the Workers until the 15[th], but haven't paid
> for the bricklayers.
>
> CW: Why don't your write first about your
> people?[15]
>
> ZS: From the 15th to the 31[st].
>
> CW: [UI]
>
> ZS: Let's first work and then we will do that
> later.
>
> CW: You write about your guys. For [the Head
> Bricklayer] [UI]
>
> ZS: [UI] Have a seat in the chair.

---

[15]    By "your people," the CW was referring to the Workers
(caulkers and laborers), whom CHAUDRY was responsible for
recruiting to the Project jobsite, as distinct from the
bricklayers, whom the Head Bricklayer was responsible for
recruiting to the Project jobsite.

AC:[16] [UI]

ZS: From the 16th to the 31st of May.

AC: [Worker #1] has 16 days, 3 hours?

ZS: The 16th, three hours?

CW: Three, three, three...

AC: [Worker #2], twelve days.

CW: Did Tariq;[17] did [Worker #1] ever work in house?[18]

AC: Yes.

CW: How many days?

AC: [UI]...

CW: Yes

---

[16]    The defendant AFZAAL CHAUDRY is abbreviated here as "AC".

[17]    According to the CW, "Tariq" is a nickname for CHAUDRY.

[18]    According to the CW, NADEEM frequently used workers who were hired by the Subcontractor (and other subcontractors who did work for SM&B) for the purpose of working on SCA projects to instead build a warehouse across the street from the SM&B Office and to build a house that NADEEM was constructing in Brooklyn as a personal residence for himself and his family.  NADEEM paid the workers who worked on these non-SCA projects with SCA funds and used building materials paid for by the SCA, such as bricks, on these non-SCA projects.  Further, when SM&B (or the Subcontractor) purchased building materials, such as bricks, which were for, or purportedly for, SCA projects, SM&B and the Subcontractor did not have to pay New York state and city sales taxes on those purchases.  By referring to the "house," the CW was referring to this personal residence in Brooklyn that NADEEM was building for himself and his family.  Workers self-reported the hours they worked at the "house" and the warehouse across the street from SM&B's office, and CHAUDRY included those hours in his charts.

AC:   I haven't written it down [UI]

CW:   Yes, because he has sixteen [UI]

AC:   I write it down, every day...

ZS:   [Worker #2].

AC:   Twelve days.

ZS:   Twelve days.

AC:   Yes.

CW:   Hmmm...

ZS:   [Worker #3].

AC:   Eleven days, six hours.

CW:   Did [Worker #3] work in the house, too, right?

AC:   I think he worked like four hours. [UI]

ZS:   What about every day?

AC:   It doesn't take too long [UI]

CW:   They do nine hours instead of eight hours.

ZS:   Hmmm.

AC:   [Worker #4], twelve days. [Worker #3]. These four hours are from the last time for [Worker #1] have one day from last time.

ZS:   Was it less?

CS:   He wrote it down less. . . Did you write [Worker #4]?

ZS:   There is no problem with anyone.  How come there is a problem with [Worker #1]? ...

CW:   Even in the house he had the same problem. And, plus, when [Worker #1] goes home there

is always a problem.  He works in the house
and on the site.  Am I right?

AC:   Yes.

CW:   [UI] . . . He worked at home and also on the
site.  I will tell you. . .

ZS:   Okay. [Worker #4].

AC:   Twelve days.

ZS:   Twelve. . .

AC:   Twelve days.

ZS:   Full. . .

AC:   [Worker #5]. . . eleven days, four hours.

ZS:   [Worker #5]. . .

AC:   Eleven days, four hours. [UI] . . . eleven
days, three hours.

ZS:   [Worker #6]

AC:   Eleven days, three hours.

ZS:   Hmmm...

AC:   [Worker #7], eleven days, three hours.

ZS:   Hmm...

AC:   [Worker #8], nine days, three hours.

ZS:   Hmmm...

        *               *               *

CW:   Hmmm. . . [Worker #8] is done.

AC:   Yes, [Worker #9], eleven days, seven hours.

ZS:   [Worker #9], eleven days.

AC:   Seven hours.

ZS:   Seven hours.

AC:   [UI] . . . [Worker #10], eleven days, three
      hours.

ZS:   For who?

AC:   [Worker #11]

        *              *              *

ZS:   Hmm... How many were for [Worker #11]?

AC:   Eleven days, three hours.

CW:   Eleven days, three hours.

AC:   [Worker #12], eleven days.

ZS:   [Worker #12], eleven days.

19.   After discussing the calculation of hours worked
by the Workers on the Project, the CW and the defendants ZAINUL
SYED and AFZAAL CHAUDRY turned to calculating the hours worked by
the bricklayers working on the Project:

AC:   Twelve days for [the Head Bricklayer]

ZS:   [Head Bricklayer]

CW:   We never paid him before.  This is the first
      time.[19]

AC:   Everyone is getting the first time.

ZS:   First time.  When is this from?  Til?

AC:   From the 16th to the 31st.

---

[19]   Here, the CW referred to the fact that this was the
first time the Head Bricklayer and the other bricklayers were
getting paid for work on this particular jobsite; up to that
point, only less-skilled Workers had done work for the
Subcontractor on the Project.

ZS: The 16th to the 31st.  And what about before?

AC: Add three days before.  Okay.

ZS: Is there anything before that?

AC: No, there is nothing there.

ZS: So he started working in May?

AC: Yes.

ZS: So, he started working after May 1st.

AC: From Thursday the 10th...

ZS: So, just tell him about the whole month.

CW: Fifteen days for [the Head Bricklayer].

AC: Eleven days for [Bricklayer #1], twelve days for [Bricklayer #2].

ZS: [Bricklayer #2], twelve days.  Okay.

AC: [Bricklayer #3], nine days.

ZS: Okay.

AC: [Bricklayer #4], three days.

ZS: Okay.

AC: There is one more: [Bricklayer #5], nine days...

D.   Obtaining Cash From Pacific

20.  Thereafter, the defendant ZAINUL SYED and the CW again discussed when the CW would go get cash from Pacific, and how much:

CW: So, should I go get the cash today or tomorrow.  Cash...

ZS: Hmmm...

CW: Should I get the cash tomorrow?

ZS: If you do it today that would be easy; otherwise you have to run tomorrow, but it's up to you.

CW: How much do I need to bring?

ZS: Thirty, 30,000

CW: First, we have to see if he even has it or not.

ZS: Check with him and if he has it that would be great. But it's up to you.

\*              \*              \*

CW: Brother Zaine,[20] how much?  30,000?

ZS: 30,300

CW: [Speaking on Telephone to Pacific] Hello? Arun? Anuj? Anuj, we need 30,300. 300. Yeah. Can I come today? I will be there. I'm leaving from Brooklyn in fifteen minutes. I will be there by 2:00. Thank you...

After this conversation, SYED wrote four separate checks payable to the Subcontractor worth $7,365.23, $9,653.54, $7,543.89 and $6,070.07, a total of $30,632.73. These checks were drawn on SM&B's bank account and stated on their face both the Brooklyn address of the SM&B Office and the Brooklyn address of the branch of SM&B's bank where the account was based. SYED signed the defendant MUZAFFAR NADEEM's name on the checks and gave them to the CW. Soon afterwards, the CW drove from Brooklyn to Pacific in New Jersey.

---

[20]   The CW used "Zaine" as a nickname for SYED.

21. After arriving at Pacific, the CW recorded his discussion with the defendant ARUN GANDHAM, a Pacific employee, about cashing the checks from SM&B:

> CW: Do you want a check for less than ten thousand dollars? Or can I give you one big check?
>
> AG:[21] You can write a check for ten thousand?
>
> CW: Anything under ten thousand, right?
>
> AG: [UI]
>
> CW: Under? Right. And if we go [about] that, then.
>
> AG: If you bring a check over ten thousand dollars, then there will be a report done.
>
> CW: Okay. So that's why it's low, right? Give me a little change . . . .

At this point in the meeting, the CW gave another Pacific employee ("Pacific Employee #2") the four checks worth a total of $30,632.73 that the defendant ZAINUL SYED had given the CW earlier that day. Pacific Employee #2 then counted out approximately $30,300 in United States currency in various denominations (Pacific charged about $300 in fees for cashing the checks) and gave the cash to the CW. From in or about September 2009 to in or about July 2012, on more than a dozen occasions the CW cashed checks from SM&B in a structured manner at the direction of SYED or the defendant MUZAFFAR NADEEM. On most of

---

[21] The defendant ARUN GANDHAM's name is abbreviated here as "AG."

28

the occasions when the CW cashed these structured checks at Pacific, GANDHAM was the Pacific employee who cashed the structured checks that the CW brought.

### E. Distributing Cash Wages

22. After leaving Pacific, the CW met with a law enforcement agent. The agent photographed the $30,300 in cash that the CW had just obtained from Pacific and the receipt Pacific had given the CW.

23. The CW, still equipped with a recording device, then returned to the SM&B Office, where he met the defendant ZAINUL SYED. The CW and SYED counted out the cash wages for each Worker and bricklayer working for the Subcontractor on the Project and put those wages in separate envelopes. SYED wrote the wage-earner's name on the outside of each envelope and the number of dollars owed to that wage-earner on the inside of the envelope. As they counted out the cash for Worker #2, SYED stated that Worker #2 was getting $1,762. As the CW had previously recorded SYED and the defendant AFZAAL CHAUDRY earlier that day saying that Worker #2 had worked twelve days (or 96 hours) during this pay period, Worker #2's wages came out to $147 per day, or about $18 per hour, far below the prevailing wage for a caulker or laborer. SYED also stated that Worker #4 was owed $1,440. As the CW had recorded SYED and the defendant AFZAAL CHAUDRY earlier that day saying that Worker #4 had also worked

twelve days during the period in question, Worker #4's wages came out to $120 per day or $15 per hour, also far below the prevailing wage of $542 per day or $469 per day for a caulker or a laborer.

24. The CW also recorded himself and the defendant ZAINUL SYED counting out cash to put into envelopes for the bricklayers who worked on the Project. According to the CW, however, SYED said that SM&B did not have enough money on hand in its accounts to give the bricklayers the full amount of money they were owed for the pay period they were calculating. Therefore, on June 6, 2012 SYED paid the bricklayers half of their pay for the period in question while promising to pay the bricklayers the other half of their pay for that pay period at a later date. For example, SYED stated that Bricklayer #3 was owed $1,125, after SYED was recorded earlier the same day saying that Bricklayer #3 had worked on the Project for nine days during the relevant period. The corresponding pay rate of $125 per day is half of the $250 daily wage that NADEEM and SM&B owed Bricklayer #3 and the other bricklayers on the Project. Of course, $250 per day was far below the $592 per day prevailing wage for bricklayers. SYED similarly stated that Bricklayer #4 was owed $1,120, or about $125 per day, after having been recorded earlier the same day saying that Bricklayer #4 had worked on the Project

for nine days during the relevant period.  Thus, Bricklayer #4,
too, was paid half of a $250 daily wage on June 6, 2012.

25.  The defendant ZAINUL SYED instructed the CW to
take the cash-filled envelopes from the SM&B Office to the
defendant AFZAAL CHAUDRY at the Project jobsite.  On the way to
perform this task, the CW showed the envelopes to a law
enforcement agent.  The agent photographed the outsides of the
envelopes, including where SYED had written the wage-earners'
names.  He also photographed the insides of the envelopes (which
had not been sealed), including the cash itself and where SYED
had written the amount of cash that was inside the envelope.  The
CW also had with him the handwritten list of workers purportedly
employed by the Subcontractor at the Project jobsite which SYED
had made earlier that day.  This was the list that SYED had based
on the charts CHAUDRY kept in a spiral notebook, which included
how many hours each worker had worked and how much he was owed
for the relevant pay period.  The agent photographed the list
SYED wrote as well.  Consistent with SYED and CHAUDRY's recorded
conversations earlier that day with the CW, the list showed that
Workers who were paid in cash by SM&B and the Subcontractor for
their work on the project were paid at a rate of between $120 and
$160 per day, and bricklayers were paid $250 per day, both far
below the prevailing wage.

26.   After leaving the agent and going to the Project
jobsite, the CW gave the envelopes with cash in them to the
defendant AFZAAL CHAUDRY to distribute to the Workers and
bricklayers.   I have viewed a video recording made on the
afternoon of June 6, 2012 by a pole camera which recorded images
of a part of the Project jobsite.   That video showed the CW
handing a set of envelopes to CHAUDRY.   According to the CW,
CHAUDRY typically kept the envelopes with cash wages locked in
his van until the end of the workday.   Then, CHAUDRY distributed
the cash wages in his van to Workers who resided in Queens;
workers who resided in Brooklyn usually returned to the SM&B
Office with CHAUDRY in his van, so CHAUDRY distributed the wages
to those workers during the ride back to the SM&B Office.   The CW
did not observe CHAUDRY distribute the cash in the envelopes on
June 6, 2012.

27.   I have examined the certified payroll forms for
the Subcontractor's workers that were submitted to the SCA
covering pay periods in the month of May 2012.   These forms
falsely stated to the SCA: (1) the names of people who worked on
the Project; (2) that all of the bricklayers and Workers who
worked on the Project were paid the prevailing wage for their
respective job classifications; and (3) that all of the people
doing brick and masonry work on the Project were members of a
qualified labor union.   In fact, many of the workers who

performed such work, in particular most of the workers for whom
the CW, the defendant ZAINUL SYED and the defendant AFZAAL
CHAUDRY created pay envelopes on June 6, 2012, were not listed on
the certified payroll as working on the Project for the
Subcontractor or SM&B.

F.   June 19, 2012 Conversations

28.   The defendant ZAINUL SYED sent the CW to Pacific
again on June 19, 2012 to obtain cash for paying cash wages to
workers by cashing checks in a structured fashion.   Like on June
12, 2012, SYED gave the CW a number of checks written on SM&B's
account to the Subcontractor.   This time, SYED gave the CW four
checks, in the amounts of $8,174.75, $7,893.50, $9,018.35 and
$7,612.40, or a total of $32,699.00.

29.   After returning from Pacific to the SM&B Office,
the CW again recorded his conversations with the defendant ZAINUL
SYED with a recording device provided by law enforcement.   Like
they did on June 6, 2012, the CW and SYED again put cash wages,
in amounts less than the prevailing wage, into envelopes for
workers on the Project.   During this meeting, SYED demonstrated
he was aware that cash transactions involving more than $10,000
must be reported to the government:

ZS:   ... But if we can make one check for 500,000
      or 100,000

CW:   I spoke with Arun [Gandham] about that and he
      said we have to report it.

ZS: If it's more than ten. For IRS. Taxes.

CW: Brother is also paying cash to workers.

ZS: Everyone does that.

CW: No, [UI]

ZS: What I think is that nobody tells anyone.

30. Later during the same conversation, the defendant ZAINUL SYED, the defendant IRFAN MUZAFFAR and the CW discussed what one should say if one was stopped by law enforcement while driving and found with large quantities of cash in the car. SYED told the CW to say that he worked in "private" construction, because contractors working in the "private sector" (as opposed to contractors working on publicly funded construction projects, like SCA projects) are not required to pay the prevailing wage and can pay wages in cash:

CW: No. But what if he do get search, what will be say about this money?

IM:[22] Those are for the workers.

CW: Can we say about giving them to workers?

IM: They don't do that much investigation.

ZS: No, they give you [UI]

CW: [UI]

ZS: Or give those in cash and just be like, "I work as a private construction..."

CW: [UI] To give it to the employees.

---

[22]    IRFAN MUZAFFAR's name is abbreviated as "IM."

ZS: For the employees.

CW: Huh.

ZS: That problem is for those SCA and IG [referring to the SCA Inspector General]. Otherwise for normal... You can hire people from the private sector and you can give them whatever you want.

IM: Yes.

ZS: But because of SCA and IG. The people from the private sector that work they get five or six hundred thousand cash, for [UI] and they get it done from the private sector.

V.   Events of July 26, 2011

31.   On July 26, 2011, nearly a year before the events described above, I, along with other law enforcement agents, conducted surveillance outside Pacific. At approximately 1:24 p.m., we observed and photographed the defendant IRFAN MUZAFFAR as he parked a white Porsche Cayenne automobile nearby and entered the Pacific storefront. The Porsche was registered to the defendant AFZAAL CHAUDRY.

32.   The defendant IRFAN MUZAFFAR exited and reentered Pacific a couple of times to move the Porsche, which was double-parked. The last time MUZAFFAR exited Pacific he was carrying a brown paper bag of a size appropriate for carrying thousands of dollars in cash. MUZAFFAR had not been carrying this bag when he entered Pacific. Pacific's bank records show that on July 26, 2011, Pacific cashed three checks worth $8,695.89, $8,759.28 and

$6,954.69, for a total of $24,409.86, all drawn on an SM&B bank account and made payable to the Subcontractor.

33.     After leaving Pacific, the defendant IRFAN MUZAFFAR drove the Porsche to a high school in the Bronx (the "High School"), where SM&B and the Subcontractor were working on a construction project pursuant to a contract with the SCA. At approximately 3:00 p.m. that day, a pole camera recording the area around the High School captured video images of MUZAFFAR handing the brown paper bag to the CW, who was not cooperating with law enforcement at the time. The CW later confirmed that on July 26, 2011 he received cash from MUZAFFAR at the High School and gave some of the cash to the defendant AFZAAL CHAUDRY in order to pay the Subcontractor's workers at the High School cash wages below the prevailing wage. The CW used the rest of the cash MUZAFFAR had given him to pay bribes to an SCA inspector, as described in paragraph six above. On many other occasions between in or about September 2009 and in or about July 2012, the CW observed MUZAFFAR either leave the SM&B Office with structured checks to cash at Pacific, return to the SM&B Office with tens of thousands of dollars in cash to make SM&B's payroll, or both. The CW also frequently heard the defendant ZAINUL SYED state that MUZAFFAR had recently gone to Pacific or was soon expected to return from Pacific with sufficient cash to make SM&B's payroll.

VI.  TECHNICAL TERMS

34.  Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

b.   Computer: A computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

c.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each

other.  Due to the structure of the Internet,
connections between devices on the Internet often cross
state and international borders, even when the devices
communicating with each other are in the same state.

d.   Storage medium: A storage medium is any physical object
upon which computer data can be recorded.  Examples
include hard disks, RAM, floppy disks, flash memory,
CD-ROMs, and other magnetic or optical media.

VII. <u>Locations To Search And Items To Seize</u>

A.   <u>SUBJECT PREMISES #1</u>

35.   SUBJECT PREMISES #1, which is known and described
as 244-246-248 ~~522~~ 52nd STREET, BROOKLYN, NEW YORK, is a two-
story warehouse made of red and tan brick which is attached to
similar warehouse buildings on both sides.  One entrance door to
SUBJECT PREMISES #1 for people (as opposed to vehicles) is
located on the right side of the structure,[23] with the number
"244" written above the doorway.  Another entrance door for
people is located on the left side of the structure, with the
numbers "246" and "248" written above the doorway.  The door on
the left side of the building is always locked, and all
individuals who enter SUBJECT PREMISES #1 do so by entering the
door on the right, under the number "244."  In between the two

---

[23]   "Right" and "left" are described in relation to the
orientation of an observer facing SUBJECT PREMISES #1 from 52nd
Street.

doors for people are garage doors designed for automobiles and construction equipment, which also open.

36. During the course of most business days after he became the nominal owner of the Subcontractor, the CW spent many hours within SUBJECT PREMISES #1, including as recently as February 6, 2013. Upon entering the door on the right side of SUBJECT PREMISES #1, beneath the number "244," a person faces a staircase going up to the right-side portion of the second floor of SUBJECT PREMISES #1.[24] Just to the left of the staircase on the first floor, and parallel to it, is a narrow hallway leading straight ahead to the main office area within SUBJECT PREMISES #1. Behind the staircase, also to the right of the hallway, is a bathroom.

37. Located within the outer part of the office area, against the wall on the right side of the room, are three desks. The CW and the defendant IRFAN MUZAFFAR share the first desk on the right. A female office assistance (the "FOA") uses the second desk on the right, and the defendant ZAINUL SYED uses the third desk on the right. On or below each of these desks is a computer. The computer on the desk used by the CW and MUZAFFAR is a laptop computer, and the computers on SYED's desk and the FOA's desk are desktop computers. Opposite these three desks, on

[24]     There are separate right-side and left-side areas of the second floor of SUBJECT PREMISES #1, with an open garage area in between.

the left side of the room, are filing cabinets containing paper
copies of business records.  Above these filing cabinets,
attached to the wall, are kitchen-style cabinets which also
contain paper copies of business records.  At the far end of this
outer office area is a glass wall, with a door on the left side.
Through the door, behind the glass wall, is the office used by
defendant MUZAFFAR NADEEM.  Within NADEEM's office is a desk.
Near this desk are file cabinets containing business records.
Also within NADEEM's office is a staircase leading to the right-
side second floor area.

38.  On the second floor of the right side of SUBJECT
PREMISES #1, above the defendant MUZAFFAR NADEEM's office, is a
room containing a couch, a computer used by NADEEM and the
defendant ZAINUL SYED, and paper documents and business records.
Also on the second floor of the right side of SUBJECT PREMISES
#1, above the bathroom, is another room containing business
records.  This computer, as well as the computers on the first
floor of SUBJECT PREMISES #1, are used by NADEEM, the CW, the
defendants ZAINUL SYED and IRFAN MUZAFFAR and their associates
for SM&B business.

39.  Also on the right side of SUBJECT PREMISES #1,
accessible from the staircase facing the door beneath the number
"244" sign, is a third-floor landing.  According to the CW, this
landing also contains business records, tools and a catwalk

connecting the right side of SUBJECT PREMISES #1 to the left side
of SUBJECT PREMISES #1.

40. Though the outside door on the left side of
SUBJECT PREMISES #1 is always locked, a person can go to the same
place, as if he had just entered through that door, by entering
through the right-side door or the garage doors and then walking
to the left. Similar to the right side of SUBJECT PREMISES #1, a
person in that spot can proceed up a facing stairway to the
second floor, or go straight ahead down a narrow hallway, just to
the right of the staircase. Behind the staircase is a bathroom.
At the end of the hallway, in the space occupied on the right
side of SUBJECT PREMISES #1 by the office area, is a kitchen. On
the second floor of the left side of SUBJECT PREMISES #1 is a
room used for counting cash paid to workers and others. On the
third floor landing are office supplies and possibly records.

41. Within the garage area behind the garage doors,
between the right side of SUBJECT PREMISES #1 and the left side
of SUBJECT PREMISES #1, is a large open area. According to the
CW, construction equipment and supplies are stored in this area.

<u>SEARCH OF SUBJECT PREMISES #1</u>

42. I have been informed by an Assistant U.S. Attorney
that, under the relevant case law, in the event of a search of
business premises that are "permeated with fraud," a broad search
warrant that authorizes the search and seizure of voluminous

business records does not run afoul of the Fourth Amendment.

National City Trading Corp. v. United States, 635 F.2d 1020, 1026

(2d Cir. 1980) (citing United States v. Brien, 617 F.2d 299, 309

(1st Cir. 1980)); see also United States v. Johnson, 108 F.3d

1370, 1997 WL 136332, at *3 (2d Cir. Mar. 21, 1997) (unpublished

summary order) (affirming broad search where affidavit "show[ed]

ample ground for finding pervasive fraud"). In this case, given

the apparent interconnections of the various business entities

and individuals and the resulting fraud schemes, a broad seizure

of data is warranted.

43. Moreover, based on my training and experience,

individuals engaged in prevailing wage fraud schemes such as that

described above often retain the items set forth in paragraph 44

below.

44. Wherefore, this affidavit seeks authority to

search for the following at SUBJECT PREMISES #1, as further

described in Attachment A2:

> a. Bank records and financial records,
> including bank statements, wire transfer
> records, cancelled checks, check stubs,
> deposit slips, withdrawal slips, and ATM
> cards and records, relating to work performed
> by SM&B or its subcontractors;

> b. Business records relating to work performed
> by SM&B or its subcontractors, including
> certificates of incorporation and
> incorporation documents; contracts, including
> contracts between SM&B and any subcontractors
> and between SM&B and the SCA, ledgers;
> documents relating to bids on SCA contracts;

financial statements; journals; notebooks; invoices;

c.   Correspondence and notes relating to work performed by SM&B or its subcontractors;

d.   Notebooks or journals documenting conversations between the defendants MUZAFFAR NADEEM, ZAINUL SYED, AFZAAL CHAUDRY, or between those defendants and other individuals;

e.   Computer and Internet passwords, User-IDs, log-ins and log-in names, Internet Protocol ("IP") numbers and addresses issued;

f.   Cell phones and other personal communication devices;

g.   Computers, computer hardware, computer software, personal digital assistant ("PDA"), passwords, data security devices, computer-related documentation, computer data, laptop computers, notebook computers, servers, hard drives, diskettes, memory storage devices, including thumb drives and memory sticks, and other magnetic storage media and files, data and information contained thereon, used to store the records and information described in this attachment as well as drafts and final versions of documents described in this attachment;

h.   Cash and other forms of currency and monetary instruments, including checkbooks, ATM cards, credit cards, debit cards and precious metals;

I.   Documents relating to the purchase of consumer items and construction materials, including credit card statements, invoices, bills, receipts and delivery or shipping paperwork in the name of SM&B, the Subcontractor, any of SM&B's other subcontractors, the defendant MUZAFFAR NADEEM, the defendant ZAINUL SYED and the defendant AFZAAL CHAUDRY;

44

media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

46.   I submit that if a computer or storage medium is found at SUBJECT PREMISES #1, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my knowledge, training, and experience, as well as that of my fellow investigators, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.   Electronic files downloaded to a storage medium can be stored for years at little or no cost.   Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten.   In addition, a computer's

operating system may also keep a record of deleted data
in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer
storage media - in particular, computers' internal hard
drives - contain electronic evidence of how a computer
has been used, what it has been used for, and who has
used it.  To give a few examples, this forensic
evidence can take the form of operating system
configurations, artifacts from operating system or
application operation, file system data structures, and
virtual memory "swap" or paging files.  Computer users
typically do not erase or delete this evidence, because
special software is typically required for that task.
However, it is technically possible to delete this
information.

d.  Similarly, files that have been viewed via the Internet
are sometimes automatically downloaded into a temporary
Internet directory or "cache."

47.  As further described in Attachment A2, this
application seeks permission to locate not only computer files
that might serve as direct evidence of the crimes described on
the warrant, but also for forensic electronic evidence that
establishes how computers were used, the purpose of their use,
who used them, and when.  There is probable cause to believe that

this forensic electronic evidence will be on any computer at
SUBJECT PREMISES #1 because:

a. Data on the storage medium can provide evidence of a
file that was once on the storage medium but has since
been deleted or edited, or of a deleted portion of a
file (such as a paragraph that has been deleted from a
word processing file). Virtual memory paging systems
can leave traces of information on the storage medium
that show what tasks and processes were recently
active. Web browsers, email programs, and chat
programs configuration information on the storage
medium that can reveal information such as online
nicknames and passwords. Operating systems can record
additional information, such as the attachment of
peripherals, the attachment of USB flash storage
devices or other external storage media, and the times
the computer was in use. Computer file systems can
record information about the dates files were created
and the sequence in which they were created.

b. Forensic evidence on a computer or storage medium can
also indicate who has used or controlled the computer
or storage medium. This "user attribution" evidence is
analogous to the search for "indicia of occupancy"
while executing a search warrant at a residence. For

example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information

48

necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

48.   In most cases, a thorough search of a premises for information that might be stored on storage media often requires agents to seize physical storage media and later review the media consistent with the warrant.   In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.   This is true because of the following:

a.   The time required for an examination.   As noted above, not all evidence takes the form of documents and files

that can be easily viewed on site.  Analyzing evidence
of how a computer has been used, what it has been used
for, and who has used it requires considerable time,
and taking that much time at SUBJECT PREMISES #1 could
be unreasonable.  As explained above, because the
warrant calls for forensic electronic evidence, it is
exceedingly likely that it will be necessary to
thoroughly examine storage media to obtain evidence.
Storage media can store a large volume of information.
Reviewing that information for things described in the
warrant can take weeks or months, depending on the
volume of data stored, and would be impractical and
invasive to attempt on-site.

b.   Technical requirements.  Computers can be configured in
several different ways, featuring a variety of
different operating systems, application software, and
configurations.  Therefore, searching them sometimes
requires tools or knowledge that might not be present
on the search site.  The vast array of computer
hardware and software available makes it difficult to
know before a search what tools or knowledge will be
required to analyze the system and its data at SUBJECT
PREMISES #1.  However, taking the storage media
off-site and reviewing it in a controlled environment

will allow its examination with the proper tools and
knowledge.

c.    Variety of forms of electronic media.  Records sought
under this warrant could be stored in a variety of
storage media formats that may require off-site
reviewing with specialized forensic tools.

49.    Based on the foregoing, and consistent with Rule
41(e)(2)(B) of the Federal Rules of Criminal Procedure, when
officers executing the warrant conclude that it would be
impractical to review the media on-site, the warrant I am
applying for would permit officers either to seize or to
image-copy storage media that reasonably appear to contain some
or all of the evidence described in the warrant, and then later
examine the seized storage media or image copies consistent with
the warrant.  The examination may require searching authorities
to employ techniques, including but not limited to
computer-assisted scans of the entire medium, that might expose
many parts of a hard drive to human inspection in order to
determine whether it is evidence described by the warrant.

50.    I recognize that SM&B ("the Company") is
a functioning company with many employees, and that a seizure of
the Company's computers may have the unintended effect of
limiting the Company's ability to conduct any legitimate business
it might perform.  As with any search warrant, I expect that

officers executing this warrant will execute the warrant
reasonably and will avoid causing unnecessary inconvenience to
the Company, its employees, and its customers.  Typically, these
steps include an incremental approach that might proceed as
follows:

  a.    Upon arriving at SUBJECT PREMISES #1, the agents would
        attempt to identify a system administrator of the
        network (or other knowledgeable employee) who would be
        willing to assist law enforcement by identifying,
        copying, and printing out paper and electronic copies
        of the things described in the warrant.  The assistance
        of such an employee might allow agents to place less of
        a burden on the Company than would otherwise be
        necessary.

  b.    If the employees choose not to assist the agents, the
        agents decide that none are trustworthy, or for some
        other reason the agents cannot execute the warrant
        successfully without themselves examining the Company's
        computers, the agents would attempt to locate the
        things described in the warrant, and would attempt to
        make electronic copies of those things.  This analysis
        would focus on things that may contain the evidence and
        information of the violations under investigation.  In
        doing this, the agents might be able to copy only those

things that are evidence of the offenses described
herein, and provide only those things to the case
agent.  Circumstances might also require the agents to
attempt to create an electronic "image" of those parts
of the computer that are likely to store the things
described in the warrant.  The agents or qualified
computer experts will then conduct an off-site search
for the things described in the warrant from the
"mirror image" copy at a later date.  If the agents
successfully image the Company's computers, the agents
will not conduct any additional search or seizure of
the Company's computers.

c.    If imaging proves impractical, or even impossible for
technical reasons, then the agents would seize those
components of the Company's computer system that the
agents believe must be seized to permit the agents to
locate the things described in the warrant at an
off-site location.  The seized components would be
removed from SUBJECT PREMISES #1.  If employees of the
Company so request, the agents will, to the extent
practicable, attempt to provide the employees with
copies of data that may be necessary or important to
the continuing function of the Company's legitimate
business.  If, after inspecting the computers, it is

determined that some or all of this equipment is no
longer necessary to retrieve and preserve the evidence,
the government will return it within a reasonable time.

B.    SUBJECT PREMISES #2

51.    SUBJECT PREMISES #2, as further described in
Attachment B1, is known and described as THE BEDROOM USED BY
AFZAAL CHAUDRY WITHIN THE BASEMENT LEVEL OF 14 BAY 20TH STREET,
BROOKLYN, NEW YORK.  This building is a detached two-story multi-
colored brick residence with a white iron entry gate and a gold
awning above the entrance door with the number "14" written on
it.  This residence is located approximately one hundred feet
south of the intersection of Bay 20th Street and 86th Street.

52.    The CW has informed me, and surveillance,
pole camera video recordings, New York Department of Motor
Vehicle records and postal records have confirmed, that the
defendant MUZAFFAR NADEEM and many of his family members,
including the defendant AFZAAL CHAUDRY, reside at the residence
located at 14 Bay 20th Street in Brooklyn, New York.  The CW has
also informed me that on two occasions the CW was invited inside
the residence containing SUBJECT PREMISES #2.  While inside on
both occasions, the CW went to the basement level of 14 Bay 20th
Street.

53.    According to the CW, the front door of the
residence at 14 Bay 20th Street is rarely used.  Instead,

residents and visitors use a side door located on the right side
of the building, which faces a driveway.  When a person enters
this side door, he steps on to a landing.  From this landing, the
person must choose one of two possible paths to follow.  One can
either go down three stairs to the basement level, or one can
walk through a door which leads up three stairs to the first
floor of the residence.

54.  After going down the three stairs to the basement
level, a person enters a living room area which contains six
couches.  On the right side of this living room are two doors,
each leading to a bedroom.  One such door is closer to the living
room entrance, and one such door is farther from the stairway and
the entrance.  In approximately the summer of 2012, the defendant
AFZAAL CHAUDRY told the CW that the second of these two bedrooms,
meaning the bedroom further from the stairway and the entrance,
is CHAUDRY's bedroom.[25]

### SEARCH OF SUBJECT PREMISES #2

55.  As described above, the defendant AFZAAL CHAUDRY
maintains a spiral notebook in which he writes the names of all
of the workers at SM&B's jobsites and the number of hours worked
by those workers.  The CW has observed that during the workday,
CHAUDRY keeps this notebook on his person, or locked in his

---

[25]    CHAUDRY has informed the CW that CHAUDRY stays in a
different bedroom, on the second floor of 14 Bay 20th Street,
when guests stay overnight at that residence.

automobile.  CHAUDRY has told the CW that at other times,
including at night, CHAUDRY keeps this notebook under the bed
where he sleeps in the basement of 14 Bay 20th Street.

56. Wherefore, this affidavit seeks authority to
search for the following, as further described in Attachment B2,
at SUBJECT PREMISES #2: any spiral notebooks used by the
defendant AFZAAL CHAUDRY to maintain records of the names of
workers at SM&B jobsites and the number of hours each of those
workers has worked.

VIII. Sealing

57. Because public filing of this document could
result in a risk of flight by the defendant, as well as
jeopardize the government's investigation, your affiant
respectfully requests that this complaint, as well as any arrest
warrant issued in connection with this complaint, be filed under
seal.

IX.  Conclusion

WHEREFORE, your deponent respectfully requests that
warrants be issued for the arrests of the defendants MUZAFFAR
NADEEM, AFZAAL CHAUDRY, ZAINUL SYED, IRFAN MUZAFFAR and ARUN
GANDHAM, so that they may be dealt with according to law.  Your
deponent further respectfully requests that warrants be issued to
search SUBJECT PREMISES #1 and SUBJECT PREMISES #2, as further

described in attachments A1 and B1, and seize the things
described in attachments A2 and B2.


_James Hughes_
JAMES HUGHES
Special Agent
IRS-CI


Sworn to before me this
___ day of February, 2013


_____
THE HON. VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## Attachment A1 to Search Warrant Affidavit for 244-246-~~8 /H~~248 ~~East~~ 52nd Street, Brooklyn, New York (Subject Premises #1)

### Description of Subject Premises #1

SUBJECT PREMISES #1, which is known and described as 244-246-248 ~~EAST~~ 52nd STREET, BROOKLYN, NEW YORK, is a two-story warehouse made of red and tan brick which is attached to similar warehouse buildings on both sides. One entrance door to SUBJECT PREMISES #1 for people (as opposed to vehicles) is located on the right side of the structure,[1] with the number "244" written above the doorway. Another entrance door for people is located on the left side of the structure, with the numbers "246" and "248" written above the doorway. In between the two doors for people are garage doors designed for automobiles and construction equipment, which also open. SUBJECT PREMISES #1 is used by SM&B both to store construction supplies and equipment, and as office space for SM&B and its owners and employees, including the defendants MUZAFFAR NADEEM, AFZAAL CHAUDRY and ZAINUL SYED.

---

[1]      "Right" and "left" are described in relation to the orientation of an observer facing SUBJECT PREMISES #1 from 52nd Street.

**Attachment A2 to Search Warrant Affidavit for 244-246-248 ~~East~~ 𝒪𝓗
52ⁿᵈ Street, Brooklyn, New York (Subject Premises #1)**

### Items to be Seized From SUBJECT PREMISES #1

a.  Bank records and financial records, including bank statements, wire transfer records, cancelled checks, check stubs, deposit slips, withdrawal slips, and ATM cards and records, relating to work performed by SM&B or its subcontractors;

b.  Business records relating to work performed by SM&B or its subcontractors, including certificates of incorporation and incorporation documents; contracts, including contracts between SM&B and any subcontractors and between SM&B and the SCA, ledgers; documents relating to bids on SCA contracts; financial statements; journals; notebooks; invoices;

c.  Correspondence and notes relating to work performed by SM&B or its subcontractors;

d.  Notebooks or journals documenting conversations between the defendants MUZAFFAR NADEEM, ZAINUL SYED, AFZAAL CHAUDRY, or between those defendants and other individuals;

e.  Computer and Internet passwords, User-IDs, log-ins and log-in names, Internet Protocol ("IP") numbers and addresses issued;

f.  Cell phones and other personal communication devices;

g.  Computers, computer hardware, computer software, personal digital assistant ("PDA"), passwords, data security devices, computer-related documentation, computer data, laptop computers, notebook computers, servers, hard drives, diskettes, memory storage devices, including thumb drives and memory sticks, and other magnetic storage media and files, data and information contained thereon, used to store the records and information described in this attachment

as well as drafts and final versions of documents described in this attachment;

h. Cash and other forms of currency and monetary instruments, including checkbooks, ATM cards, credit cards, debit cards and precious metals;

i. Documents relating to the purchase of consumer items and construction materials, including credit card statements, invoices, bills, receipts and delivery or shipping paperwork in the name of SM&B, the Subcontractor, any of SM&B's other subcontractors, the defendant MUZAFFAR NADEEM, the defendant ZAINUL SYED and the defendant AFZAAL CHAUDRY;

j. Any and all documents, records and objects reflecting payments, in cash or any other form, to SCA employees or labor union officials;

k. Any and all documents, records and objects reflecting the following: wages and benefits paid to workers on SM&B jobsites; the number of hours worked by such workers; the names of such workers; whether such workers were members of a labor union; payroll, income and unemployment insurance taxes paid on behalf of such workers, including but not limited to jobsite sign-in sheets; handwritten notes; certified payroll records; payroll tax records; income tax records; remittance reports; time sheets; shop steward reports; health plan enrollment forms; personnel files; health plan membership cards; health plan claim forms; union membership cards; annuity, welfare, pension or apprenticeship participant statements; or any forms or records submitted to or maintained by the following agencies or organizations: the New York State Department of Labor, the New York State Department of Taxation and Finance, the United States Department of Labor, the United States Social Security Administration, the Internal Revenue Service and other branches of the United States Treasury Department, certified labor unions and benefit funds administered by labor unions.

## Attachment B1 to Search Warrant Affidavit for the Bedroom Used by Afzaal Chaudry Within the Basement Level of 14 Bay 20th Street Brooklyn, New York (Subject Premises #2)

### Description of Subject Premises #2

SUBJECT PREMISES #2, the premises known as described as is known and described as THE BEDROOM USED BY AFZAAL CHAUDRY WITHIN THE BASEMENT LEVEL OF 14 BAY 20TH STREET, BROOKLYN, NEW YORK, is located within a detached, two-story multi-colored brick residence with a white iron entry gate and a gold awning above the entrance door with the number "14" written on it. This residence is located approximately one hundred feet south of the intersection of Bay 20th Street and 86th Street.

A visitor to 14 Bay 20th Street reaches SUBJECT PREMISES #2 by entering the building through a side door located on the right side of the building, which faces a driveway. When a person enters this side door, he steps on to a landing. From this landing, the person must choose one of two possible paths to follow. One can either go down three stairs to the basement level, or one can walk through a door which leads up three stairs to the first floor of the building.

After going down the three stairs to the basement level, a person enters a living room area which contains six couches. On the right side of this living room are two doors, each leading to a bedroom. One such door is closer to the living room entrance, and one such door is farther from the stairway and the entrance. The second of these two bedrooms, meaning the bedroom further from the stairway and the entrance, is SUBJECT PREMISES #2, CHAUDRY's bedroom.

**<u>Attachment B2 to Search Warrant Affidavit for the
Bedroom Used by Afzaal Chaudry Within the Basement
Level of 14 Bay 20th Street Brooklyn, New York (Subject
Premises #2)</u>**

<u>Items to be Seized From SUBJECT PREMISES #2</u>

    a.    any spiral notebooks used by the defendant
AFZAAL CHAUDRY to maintain records of the
names of workers at SM&B jobsites and the
number of hours each of those workers has
worked.